UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| Russell D. Knowles, individually and as attorney in fact for Bernard A. Knowles, and Bernard A. Knowles, through his attorney-in-fact Russell D. Knowles, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>TD Ameritrade Holding Corporation; TD Ameritrade, Inc.; TD Ameritrade Clearing, Inc.; and TD Ameritrade Investment Management, LLC,<br><br>　　　　　　　Defendants. | Case No. 8:19-cv-00047-RFR-SMB |

## SECOND  AMENDED CLASS ACTION COMPLAINT
### (JURY TRIAL DEMANDED)

Plaintiffs Russell D. Knowles, individually and as attorney in fact for Bernard A.

Knowles, Bernard A. Knowles, through his attorney-in-fact Russell D. Knowles, on behalf of

themselves and on behalf of all others similarly situated, by and through their undersigned

counsel, complaining in their Second Amended Class Action Complaint of the Defendants TD

Ameritrade Holding Corporation; TD Ameritrade, Inc.; TD Ameritrade Clearing, Inc.; and TD

Ameritrade Investment Management, LLC, allege and state as follows:

### JURISDICTION AND VENUE

1.　　　Plaintiffs invoke this Court's jurisdiction pursuant to 28 U.S.C. § 1332(d).

2.　　　The unlawful practices and acts alleged herein, on information and belief, were

committed in Douglas County, Nebraska, within the District of Nebraska.  The Client Agreement

between Plaintiffs and Defendants is governed by Nebraska law.  The Client Agreement provides

that venue for all disputes arising out of or relating to the Client Agreement will be in the courts

of Nebraska.

## PARTIES

3.      Plaintiff Russell D. Knowles is a resident of the state of South Carolina and a

client who had a joint taxable brokerage account with Defendants pursuant to the standard Client

Agreement.  Plaintiff Russell D. Knowles additionally holds a power of attorney and is the

attorney-in-fact for his father, Plaintiff Bernard A. Knowles.

4.      Plaintiff Bernard A. Knowles is a resident of the state of South Carolina, and a

client who had a joint taxable brokerage account with Defendants pursuant to the standard Client

Agreement.

5.      Defendant TD Ameritrade Holding Corporation, on information and belief, is the

parent corporation and sole equity holder of TD Ameritrade, Inc., with its principal place of

business at 200 South 108th Avenue, Omaha, Nebraska 68154.

6.      Defendant TD Ameritrade, Inc. ("TD Ameritrade"), on information and belief, is

a wholly-owned subsidiary of TD Ameritrade Holding Corporation, with its principal place of

business at 200 South 108th Avenue, Omaha, Nebraska 61854.  TD Ameritrade is a financial

services company which acts as a broker-dealer for clients nationwide.  TD Ameritrade is

engaged in the trading of stocks and bonds for itself and more than 11 million clients.  TD

Ameritrade has more than $1.3 trillion in assets and places an average of about 800,000 client

trades per day.  TD Ameritrade's annual net revenue in fiscal year 2018 was $5.5 billion.

7.      Defendant TD Ameritrade Clearing, Inc., on information and belief, is an indirect

wholly owned subsidiary of TD Ameritrade Holding Corporation, with its principal place of

business at 200 South 108th Avenue, Omaha, Nebraska 61854.  TD Ameritrade Clearing, Inc.

provides trade execution and clearing services to TD Ameritrade, Inc., and its brokerage clients

nationwide.

8.      Defendant TD Ameritrade Investment Management, LLC ("TDAIM"), on

information and belief, is a wholly-owned subsidiary of TD Ameritrade Holding Corporation,

with its principal place of business at 200 South 108th Avenue, Omaha, Nebraska 61854.

TDAIM provides investment advisory and management services to TD Ameritrade, Inc., and its

brokerage clients nationwide.

## FACTUAL ALLEGATIONS

9.      Defendant TD Ameritrade, Inc. is a financial services firm which, among other

things, provides brokerage services to individual clients nationwide.

10.     Defendant TD Ameritrade Clearing, Inc. provides trade execution and clearing

services to TD Ameritrade, Inc., and its brokerage clients nationwide.

11.     Defendant TDAIM provides investment advisory and management services to TD

Ameritrade and its brokerage clients nationwide, including to Plaintiffs and Class members, who

hold assets in managed portfolios designated as the Essential, Selective, Personalized, Guidance

Solution and other Portfolios (collectively, "the Portfolios").

12.     "Essential Portfolios" can be opened with TDAIM with an initial investment of

$5,000.00 and "Selective Portfolios" can be opened with an initial investment of $25,000.00.

13.     The Portfolios are managed by TDAIM investment professionals who make

trading decisions such as adding or removing an investment from the client's portfolio, or by

adjusting exposure to a particular asset class.

14.     Plaintiffs opened a brokerage account with Defendants.  Defendants agreed to

provide brokerage services to Plaintiffs, including the execution of orders and trades pursuant to the "TD Ameritrade, Inc. Client Agreement."  See TD Ameritrade, Inc. Client Agreement EXHIBIT 1; Excerpts from Contract Documents EXHIBIT 4, ¶¶ 1 through 6.

15.    Defendant TDAIM provides investment advisory services for Plaintiffs and Class members who held assets in the Portfolios pursuant to the terms of the "TD Ameritrade Investment Management, LLC Service Agreement," which incorporates by reference the "TD Ameritrade, Inc. Client Agreement" and TDAIM's "Disclosure Brochure" filed with the U.S. Securities and Exchange Commission as part of its Form ADV.  See TD Ameritrade Investment Management, LLC Service Agreement EXHIBIT 2; TD Ameritrade Investment Management, LLC Disclosure Brochure EXHIBIT 3.[1]

16.    Plaintiffs and Class Members agreed to pay an annual advisory fee to Defendants for managing their account, based on a percentage of assets held in the account.  See Excerpts from Contract Documents EXHIBIT 4, ¶¶ 14, 23 and 29; Service Agreement EXHIBIT 2, p. 15 (describing fees on Essential Portfolios); and Disclosure Brochure EXHIBIT 3, pp. 15-19 (describing fees on various portfolios).

17.    The Portfolios are managed accounts provided on a discretionary basis, under which TDAIM assumes all investment duties with respect to the assets in the account and has sole discretion with respect to such assets.  See Excerpts from Contract Documents EXHIBIT 4, ¶ 7.  Accordingly, Portfolio account holders, including Plaintiffs and Class members, delegate to TDAIM the authority to select the investments to be included within the Portfolio and to

---

[1]  For ease of reference, Plaintiffs have prepared EXHIBIT 4, which contains relevant excerpts from the Client Agreement (EXHIBIT 1), the Service Agreement (EXHIBIT 2) and the Disclosure Brochure (EXHIBIT 3).  The excerpts in EXHIBIT 4 include cites to the specific provisions of the original source contract documents.

4

effectuate trades of securities in accordance with the investment strategy selected for the account without the necessity of obtaining the client's approval of any particular investment or the client's consent for any particular trade of an investment asset included within the Portfolio.  See Excerpts from Contract Documents EXHIBIT 4, ¶¶ 7, 9, 13, 17, 18, 24, 25, 30, 31, 35, 37, 39, 47 and 48.

18.    TDAIM is responsible for maintaining only a small portion of each Portfolio in cash or cash equivalents, which upon information and belief is agreed to be either 2% or a range from 1%-3% depending upon the specific Portfolio chosen.  See Excepts from Contract Documents Exhibit 4, ¶¶ 8, 19, 25, 32, 33, 35, 37, 39 and 43.

19.    Plaintiffs Russell D. Knowles and Bernard A. Knowles at all relevant times held a joint taxable brokerage account at TD Ameritrade in a managed Portfolio that was part of the Essential Portfolios.

20.    The Essential Portfolios are offered electronically via the Internet as the primary channel of interaction with TDAIM and may be referred to as a robot-advisory service.  The Essential Portfolios service uses exchange-traded funds ("ETFs") as the sole investment vehicles.

21.    ETFs are investment companies that are registered under the Investment Company Act of 1940, typically as open-end funds or unit investment trusts ("UITs").  They have the flexibility of trading intraday.  Most ETFs are passively managed and may provide investors with diversification, cost and tax efficiency, liquidity and marginability.  ETFs sell and redeem their shares at net asset value ("NAV") only in large blocks of shares (such as 50,000) called "Creation Units" and track specific domestic and foreign market indices.  Institutional investors create or redeem the Creation Units.  After creation, the ETF shares trade between investors like a stock.  Because ETF shares trade freely and continuously, the market determines

5

prices, and investors can buy or sell shares at any time the markets are open.  <u>See</u> Service

Agreement EXHIBIT 2, p. 14.

22.    Upon information and belief, the Selective and other Portfolios are offered using

either mutual funds or ETFs.  <u>See e.g.</u> Disclosure Brochure EXHIBIT 3, pp. 2-5.

23.    Plaintiffs and Defendants agreed that the assets in the Essential Portfolios were to

be long-term investments which would remain continually invested in the market according to

the strategy selected by Plaintiffs.

24.    The Essential Portfolios allocated assets among "the domestic equity,

international equity, emerging markets, domestic and international fixed income asset classes,

supplemented by cash and cash alternatives keyed to your cash sweep vehicle."  The Essential

Portfolios contained several investment models ranging from "Conservative" to "Aggressive."

The Defendants recommended one of the investment models for Plaintiffs and Class members

based upon the "Profile Information" provided by the Plaintiffs and other Class members.  <u>See</u>

Excerpts from Contract Documents EXHIBIT 4, ¶ 25.

25.    TDAIM selected the ETFs included in the Essential Portfolios.  TDAIM agreed to

maintain only a small portion, approximately 1%-3%, of the Essential Portfolios accounts in cash

or cash equivalents, with the balance of the account assets to be invested in the ETFs selected by

TDAIM and allocated among the ETFs in the accordance with the investment model selected.

<u>See</u> Excerpts from Contract Documents EXHIBIT 4, ¶ 25; <u>see also</u> Excepts from Contract

Documents Exhibit 4, ¶¶ 8, 19, 32, 33, 35, 37, 39 and 43.

26.    Defendants agreed to make all purchases and sales of securities necessary to

maintain the asset allocations in the Portfolios in accordance with the selected investment

strategy daily during regularly scheduled trading windows, or more often if necessary.  See Excerpts from Contract Documents EXHIBIT 4, ¶¶ 20, 21, 26, 27, 34, 40, 44, 45 and 46.

27.      On information and belief, on or about November 15, 2017, TDAIM began offering its clients a "tax-loss harvesting feature" in certain Portfolios.  Upon information and belief, tax-loss harvesting was initially available only in taxable accounts utilizing the Essential Portfolios and Selective Portfolios services, which invested in ETFs.  On information and belief, the tax-loss harvesting service was later expanded to taxable accounts which invested in ETFs utilizing the Personalized, Guidance Solution and other Portfolios.

28.      The tax-loss harvesting feature is a computerized trading feature utilized by Defendants that is designed to sell securities at a loss to offset potential capital gains and also up to $3,000 per year on taxable income.

29.      The "wash sale rule," as codified at 26 U.S. Code § 1091 and interpreted in regulations promulgated by the Internal Revenue Service at 26 C.F.R. § 1.109-1, et. seq., prohibits an investor from claiming a tax loss if an investor repurchases the same security (or a substantially identical security) either 30 days before or 30 days after selling a security for a loss.  Defendants' automated tax-loss harvesting feature is designed to avoid violations of the wash sale rule.

30.      The tax-loss harvesting feature automatically reviews the client's account each trading day for any investments in ETFs that have unrealized losses.  Specifically, the program looks at the individual tax lot to identify investment losses meeting or exceeding a specified loss threshold.  If the threshold is met, that tax lot is supposed to be sold to take advantage of the tax losses and shares of a replacement security that is closely correlated to the sold security is to be contemporaneously purchased to maintain the portfolio's asset allocation and risk characteristics, all while avoiding violation of the "wash sale rule."  See Excerpts from Contract Documents

EXHIBIT 4, ¶¶ 12, 36, 38 and 41.

31.    Clients are required to opt in to the automatic tax-loss harvesting feature by affirmatively activating it on their account.

32.    Plaintiffs activated the "Tax-Loss Harvesting" feature on their taxable Essential Portfolios account.  In doing so, Plaintiffs and Defendants agreed that Defendants were to review their account on a daily basis, sell ETFs that have unrealized losses based on a specified loss threshold, and contemporaneously replace the sold security by buying shares of a replacement security that is closely correlated to the sold security to maintain the portfolio's asset allocation and risk characteristics.  See Excerpts from Contract Documents EXHIBIT 4, ¶¶ 12, 36, 38 and 41.

33.    As alleged above, pursuant to the contract documents, TDAIM undertook various obligations, including the sole responsibility for development of the recommend investment models and asset allocations for the Portfolios and selections of the ETFs to be included in the Portfolios' investment strategies.  TDAIM determined the universe of ETFs that would be available for investment by Portfolios account holders.  In selecting the universe of ETFS available for investment, TDAIM both agreed to and a had a duty to be cognizant of its additional duty to properly execute its Tax Loss Harvesting service for customers who activated that feature on their account.  As such, TDAIM was responsible for ensuring that a sufficient number of appropriate ETFs were included in the pool of investments available to investors in the Portfolios such that the tax-loss harvesting feature could function properly in the event of investment losses triggering tax loss sales by ensuring that a sufficient selection of comparable ETFs were available on the Portfolios' investment menu for contemporaneous purchase without running afoul of the wash sale rule.

34.    Alternatively, Defendants in order to comply with its agreement to maintain the asset allocations, risk characteristics, and agreed cash investments percentages for the Portfolios were obligated to ensure that a client's assets were not automatically sold pursuant to the tax-loss harvesting feature when an alternative closely correlated security (ETF) was not available for contemporaneous purchase.

35.    On or about October 5, 2018, Defendants purchased a position on Plaintiff's behalf in the iShares Core S&P Total US Stock Mkt ETF ("ITOT ETF").

36.    On or about October 12, 2018, pursuant to the automatic tax-loss harvesting feature, Defendants sold Plaintiff's position in the ITOT ETF after having five minutes earlier already purchased an equivalent position on Plaintiff's behalf in the Vanguard Total Stock Market ETF ("VTI ETF").

37.    On or about December 17, 2018, pursuant to the automatic tax-loss harvesting feature, Defendants sold Plaintiffs' position in the VTI ETF and, thirty minutes later, purchased an equivalent position on Plaintiffs' behalf in the ITOT ETF.

38.    On or about December 24, 2018, pursuant to the automatic tax-loss harvesting feature, Defendants again sold Plaintiff's position in the ITOT ETF, but did not contemporaneously purchase an equivalent position in a comparable broadly based US stock market ETF.  Instead, Defendants permitted the proceeds from the sale of the ITOT ETF to sit in a cash alternative for 18 days.

39.    On December 24, 2018, when Defendants automatically sold Plaintiff's position in the ITOT ETF in a tax-loss harvesting sale, the proceeds from the sale could not have been contemporaneously re-invested in the VTI ETF (as had occurred previously in tax-loss

harvesting sales) without violating the IRS's thirty-day wash sale rule because only seven days had passed since Plaintiff's position in the VTI ETF had been sold.

40.     During the eighteen days that Defendants left the proceeds from the sale of Plaintiffs' investment in the ITOT ETF sitting in cash equivalents, far more than the agreed 1% - 3% of Plaintiffs investments were invested in cash or cash equivalents, with the actual percentage of Plaintiffs' assets that Defendants permitted to sit in cash being approximately 35%.

41.     On or about January 11, 2019, purportedly pursuant to the automatic tax-loss harvesting feature, Defendants finally purchased a position on Plaintiffs' behalf in a third broadly based US Stock Market ETF, the SPDR Portfolio Total Stock Market ETF ("SPTM ETF").

42.     As a result of the eighteen-day delay by Defendants in purchasing a position in a comparable broadly based US stock market ETF after automatically selling Plaintiffs' position in the ITOT ETF, Plaintiffs' assets, intended to be continually invested in a broadly-based stock market ETF, substantially decreased in value.  Plaintiffs' assets, which had dropped in value when sold on December 24, 2018, did not benefit from the subsequent market recovery and increase in value, thereby causing the investment to be worth substantially less as of January 11, 2019, when the funds finally were re-invested in a comparable broadly based stock market ETF.

43.     On information and belief, Defendants, by virtue of the automatic tax-loss harvesting feature which did not operate as agreed, are liable for causing Plaintiffs' loss in the value of their account.

44.     On information and belief, Defendants failed to contemporaneously purchase a position in a comparable broadly based stock market ETF after automatically selling Plaintiffs' position in the ITOT ETF on December 24, 2018, because Defendants had failed to cause a sufficient number of comparable broadly based US stock market ETFs to be made available in

the pool of investments available to their Essential Portfolios clients such that multiple tax losses could be harvested as agreed while also keeping clients invested in comparable ETFs which would maintain the character of the clients' investment in accordance the selected investment strategy.

45.     In the alternative, Plaintiffs were damaged as result of Defendants' failure to prevent Plaintiffs' ETFs from being sold when Defendant knew that it had no comparable repurchase option available due to the wash sale rule and that the sale would expose Plaintiffs to the risk of having a significant portion of their assets invested in a manner that did not comply with the parties' agreement and with Plaintiffs' selected investment strategy.

46.     On information and belief, Plaintiffs have suffered a financial loss as a result of Defendants' failure to have sufficient, appropriate investment options available for proper operation of the automatic tax-loss harvesting feature, including, but not limited to, a failure to have more than two broad US Stock Market ETFs available for investment by account holders in the Essential and other Portfolios, or in the alternative to have a "stop" feature in the tax-loss harvesting program that would prevent the ETFs from being sold when there was no repurchase option available.

47.     The tax-loss harvesting feature included in the Essential Portfolios and activated by Plaintiffs with respect to their account also is offered in other Portfolios.  See Excerpts from Contract Documents EXHIBIT 4, ¶¶ 12, 36, 38 and 41.

48.     Class members are other clients of Defendants who had taxable accounts in the Essential, Selective, Personalized, Guidance Solution and other Portfolios and who had activated the tax-loss harvesting feature on their accounts.  Upon information and belief, class members' Portfolios accounts were subject to the same contractual terms applicable to Plaintiffs' account.

Defendants accordingly had the same obligations with respect to Class members' accounts, which included, among other things, the obligation to develop investment models, to select the pool of ETFs and other assets available for the investment within the various investment models in each Portfolio, to keep the clients' assets continuously invested in a manner consistent with their chosen investment model, to maintain only the agreed portion of the assets in cash or cash equivalents (upon information and belief either 2% or a range of 1% to 3%), to daily execute transactions necessary to maintain the agreed investment strategy, to review the client's account each trading day for any individual tax lots investments in ETFs that have unrealized losses exceeding a specified threshold, and to sell positions in ETFs with unrealized losses exceeding the specific threshold to take advantage of the tax losses and contemporaneously purchase a comparable ETF in order to maintain the portfolio's asset allocation and risk characteristics while avoiding violation of the "wash sale rule."

49.     On information and belief, an unknown but substantial number of Defendants' customers have suffered a similar loss as a result of Defendants' unlawful acts and omissions with regard to the automatic tax-loss harvesting function in their accounts as described herein. Defendants have admitted that:

> This has become a client concern that has been exposed with our Tax Loss Harvesting feature especially from the last quarter and the terrible down side it had. With Tax Loss Harvesting, as you know, when a position takes a 5% loss we will sell the position to realize a loss and if an alternative is available we will purchase the replacement position to keep invested. Unfortunately with multiple trades from the big loss from that quarter we did not have enough alternatives to buy back into.  While the Tax Loss Harvesting is doing exactly what it is supposed to, you are not completely out of options.  At this time we do not have another option to purchase a position, and as soon as we can we will use the funds to get invested back into the market for you.

EXHIBIT 5, Electronic Message dated 1/9/19 from Paul Bradford of TD Ameritrade Investment Management Services.

50.    Plaintiffs do not allege that Defendants made any misrepresentation or omission of material fact in connection with the purchase or sale of a security or with the management and administration of the automatic tax-loss harvesting feature in the Portfolios.  Defendants simply failed to perform the automatic tax-loss harvesting due to Defendants' failure to have sufficient, appropriate investment options available for proper operation of the automatic tax-loss harvesting feature, or in the alternative to have a "stop" feature in the tax-loss harvesting program that would prevent the ETFs from being sold when there was no repurchase option available.

51.    Plaintiffs do not allege that Defendants used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a security or with the management and administration of the automatic tax-loss harvesting feature in the Portfolios. Defendants simply failed to perform the automatic tax-loss harvesting due to Defendants' failure to have sufficient, appropriate investment options available for proper operation of the automatic tax-loss harvesting feature, or in the alternative to have a "stop" feature in the tax-loss harvesting program that would prevent the ETFs from being sold when there was no repurchase option available.

## CLASS ACTION ALLEGATIONS

52.    Plaintiffs incorporate each of the foregoing allegations as fully as if repeated herein verbatim.

53.    Plaintiffs bring this suit individually and as a class action under Rule 23 of the Federal Rules of Civil Procedure, for the purpose of asserting the claims alleged in this

Complaint on a common basis.  Plaintiffs bring this action on behalf of themselves and all other

similarly situated persons as members of the following class comprised of:

> For the period of November 15, 2017, until the present date and continuing during
> the pendency of this action, a class consisting of all of Defendants' clients who
> have taxable brokerage accounts in which the client had activated the automatic
> tax-loss harvesting feature in the Essential, Selective, Personalized, Guidance
> Solution and other Portfolios, and whose account experienced an automatic tax-
> loss harvesting sale at any time in which a position in a comparable ETF was not
> contemporaneously purchased, thereby resulting in a loss of value in the client's
> account.  (Excluded from the Class are the officers, directors and employees of
> Defendants.)

54.    Plaintiffs reserve the right to modify or amend the definitions of the Class after

they have had an opportunity to conduct discovery.

55.    **Rule 23(a)(1) Numerosity:**  The members of the Class are so numerous that their

individual joinder is impracticable.  Defendants have more than 11 million client accounts.

Plaintiffs are informed and believe that the proposed Class contains at least thousands and

possibly far more of Defendants' clients who have been damaged by Defendants' conduct as

alleged herein.  Record owners and other members of the Class may be identified from records

maintained by Defendants and may be notified of the pendency of this action by mail, using the

form of notice similar to that customarily used in class actions.

56.    **Rule 23(a)(2) Existence of Common Questions of Law and Fact:**  This action

involves common questions of law and fact, which include, but are not limited to, the following:

    a.   Whether a contract existed between Defendants and members of the Class;

    b.   Whether Defendants failed to properly create and establish the automatic
        tax-loss harvesting feature in the Portfolios;

    c.   Whether Defendants failed to properly manage and administer the
        automatic tax-loss harvesting feature in the Portfolios;

d. Whether Defendants failed to contemporaneously re-invest Plaintiffs' and Class members' funds upon the tax-loss harvesting sale of a position in a given ETF held in the Portfolios in a similar, but not substantially identical, ETF, or in the alternative, prevent Plaintiffs' and Class members' assets from being sold when there are no suitable alternative ETFs available for purchase, so that Plaintiffs' and Class members' assets remained invested as directed and desired by them;

e. Whether Defendants caused Plaintiffs' and Class members to incur investment losses and decreases in the value of assets held in the Portfolios due to delays in the reinvestment of Plaintiffs' and Class members' assets in comparable ETF following a tax-loss harvesting sale; or in the alternative, due to Defendants' failure to prevent Plaintiffs' and Class members' assets from being sold when another suitable ETF was not available for purchase;

f. Whether Defendants failed to ensure that a sufficient number and appropriate selection of ETF investment options in the Portfolios were available to Plaintiffs and Class members for investment purposes and the operation of the tax-loss harvesting feature at all necessary times, or in the alternative, failed to prevent Plaintiffs' and Class members' assets from being sold when another suitable ETF was not available for purchase; and

g. Whether Plaintiffs and Class members are entitled to damages.

57. **Rule 23(a)(3) Typicality:** Plaintiffs and all members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged

15

herein are based on the same violations by Defendants that harmed Plaintiffs and members of the Class.  By automatically selling positions in an ETF held in the Portfolios  pursuant to the tax-loss harvesting feature, and not contemporaneously purchasing an equivalent position in a comparable ETF, Plaintiffs and all members of the Class were subjected to the same wrongful conduct and losses caused by Defendants' acts and omissions.  Plaintiffs' claims are typical of the Class' claims and do not conflict with the interests of any other members of the Class.  Defendants' unlawful acts and omissions concern the same tax-loss harvesting feature described herein irrespective of where they occurred or were experienced.

58.     **Rule 23(a)(4) Adequacy:**  Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Class.

59.     **Rule 23(b)(1) Prosecuting Separate Actions:** Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the Class.

60.     **Rule 23(b)(3) Predominance and Superiority of Class Action:**  Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

a.   Absent a class action, members of the Class as a practical matter will be unable to obtain redress.  Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Class

16

members will not be reimbursed for losses caused by Defendants' acts or omissions with regard to the automatic tax-loss harvesting feature;

b.   It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

c.   When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

d.   A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

e.   A class action regarding the issues in this case does not create any problems of manageability;

f.   Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate;

g.   By pursuing a uniform course of conduct with regard to its automatic tax-loss harvesting feature, Defendants have caused investment losses to all members of the Class; and

h.   As a result of Defendants' acts or omissions with regard to the automatic tax-loss harvesting feature, each member of the Class has suffered damages to an extent within the peculiar knowledge of Defendants.

61.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

17

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

62.     Plaintiffs incorporate each of the foregoing allegations as fully as if repeated herein verbatim.

63.     Plaintiffs and Class members entered into a written contract and agreement with Defendants for financial services, including the proper management of a taxable brokerage account and the provision of investment advisory and management services.  Implied in that contract is a duty or covenant of good faith and fair dealing.

64.     The terms and conditions of the contract between Plaintiffs and Class members are set forth in the Client Agreement, Service Agreement, and Disclosure Brochure as described herein.

65.     Defendants promised to properly create, establish, manage and administer the taxable brokerage accounts of Plaintiffs and Class members, including the proper management and administration of the tax-loss harvesting feature as described herein when activated by Plaintiffs and Class members.

66.     Plaintiffs and Class members performed all conditions precedent to faithful performance of the contract by Defendants.

67.     Defendants, by their acts and omissions as described herein, failed in their duty to perform the contract with care, skill, reasonable expediency, and faithfulness the thing agreed to be done.

68.     Defendants, by their acts and omissions as described herein, failed to perform such contract and breached the same, including, but not limited to, a breach of their duty to

ensure that the automatic tax-loss harvesting feature maintained the value of Plaintiffs' and Class members' position in a given category of investment held in the Portfolios and keep funds invested as directed and desired by Plaintiffs and Class members.

69.     Defendants breached their duty in contract in one or more of the following ways:

a.    By failing to properly create and establish the automatic tax-loss harvesting feature in the Portfolios;

b.    By failing to properly manage and administer the automatic tax-loss harvesting feature in the Portfolios;

c.    By failing to ensure the algorithm for the tax-loss harvesting program worked as agreed;

d.    By failing to contemporaneously re-invest Plaintiffs' and Class members' funds upon the tax-loss harvesting sale of a position in a given ETF held in the Portfolios in a comparable ETF;

e.    By failing to prevent the sale of Plaintiffs' and Class Members' position in an ETF when no other suitable replacement option was available for purchase;

f.    By causing Plaintiffs' and Class members to incur investment losses and decreases in the value of assets held in the Portfolios due to delays in the reinvestment of Plaintiffs' and Class members' assets in a comparable ETF following a tax-loss harvesting sale;

g.    By failing to ensure that a sufficient number and appropriate selection of ETF investment options in the Portfolios were available to Plaintiffs and Class members for investment purposes and the operation of the tax-loss

harvesting feature at all necessary times, including but not limited to a

sufficient number of broad US Stock Market ETFs;

h.  By failing to keep the Plaintiffs' and Class members assets continuously

invested in a manner consistent with their chosen investment models;

i.  By failing to maintain only the agreed portion of the Plaintiffs' and Class

Members assets in cash or cash equivalents;

j.  By failing to daily execute transactions necessary to maintain the Plaintiffs'

and Class Members' respective investment strategies; and

k.  In other ways to be discovered in the course of this action or proven at

trial.

70.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and

Class members have suffered actual damages, including, but not limited to, financial losses

incurred from the improper management and administration of tax-loss harvesting sales.

Plaintiffs are informed and believe that they are entitled to compensation from these Defendants,

jointly and severally, for such actual damages.

71.    Plaintiffs do not allege that Defendants made any misrepresentation or omission

of material fact in connection with the purchase or sale of a security or with the management and

administration of the automatic tax-loss harvesting feature in the Portfolios.    Defendants simply

failed to perform the automatic tax-loss harvesting due to Defendants' failure to have sufficient,

appropriate investment options available for proper operation of the automatic tax-loss

harvesting feature, or in the alternative to have a "stop" feature in the tax-loss harvesting

program that would prevent the ETFs from being sold when there was no repurchase option

available.

20

72.     Plaintiffs do not allege that Defendants used or employed any manipulative or deceptive device or contrivance in connection with purchase or sale of a security or with the management and administration of the automatic tax-loss harvesting feature in the Portfolios. Defendants simply failed to perform the automatic tax-loss harvesting due to Defendants' failure to have sufficient, appropriate investment options available for proper operation of the automatic tax-loss harvesting feature, or in the alternative to have a "stop" feature in the tax-loss harvesting program that would prevent the ETFs from being sold when there was no repurchase option available.

### SECOND CAUSE OF ACTION
**(Negligence / Gross Negligence)**

73.     Plaintiffs incorporate each of the foregoing allegations as fully as if repeated herein verbatim.

74.     Defendants owed a duty to Plaintiffs and Class members to properly create and establish the tax-loss harvesting feature in the Portfolios.

75.     Defendants owed a duty to Plaintiffs and Class members to properly manage and administer the tax-loss harvesting feature in the Portfolios.

76.     Defendants owed a duty to offer and provide a sufficient number of appropriate investment options available for proper operation of the automatic tax-loss harvesting feature, including, but not limited to, offering more than two broad US Stock Market ETFs available for investment by account holders in the Portfolios, or in the alternative, to have a "stop" feature to prevent the sale of Plaintiffs' position in an ETF when there are no other suitable options available for purchase within the program, in order to allow the tax loss harvesting service to perform its intended function while also permitting Plaintiffs and Class members to remain invested in the market in alternative ETFs which met their investment objectives while also

complying with the wash sale rule.

77.    Defendants were negligent in one or more of the following ways:

a.    By failing to properly create and establish the automatic tax-loss harvesting feature in the Portfolios;

b.    By failing to properly manage and administer the automatic tax-loss harvesting feature in the Portfolios;

c.    By failing to ensure the algorithm for the tax-loss harvesting program worked as agreed;

d.    By failing to contemporaneously re-invest Plaintiffs' and Class members' funds upon the tax-loss harvesting sale of a position in a given ETF held in the Portfolios in a comparable ETF;

e.    By failing to prevent the sale of Plaintiffs' and Class Members' position in an ETF when no other suitable replacement option was available for purchase;

f.    By causing Plaintiffs' and Class members to incur investment losses and decreases in the value of assets held in the Portfolios due to unreasonable delays in the reinvestment of Plaintiffs' and Class members' assets in a comparable ETF following a tax-loss harvesting sale;

g.    By failing to ensure that a sufficient number and appropriate selection of ETF investment options in the Portfolios were available to Plaintiffs and Class members for investment purposes and the operation of the tax-loss harvesting feature at all necessary times, including but not limited to a sufficient number of broad US Stock Market ETFs;

     h.   By failing to use due care in performing its obligation to select ETFs for inclusion in the pool of investments available to for investment by investors in the Portfolios;

     i.   By failing to use due care by failing to consider the impact of multiple market drops exceeding the tax loss harvesting threshold within the period covered by the wash sale rule when designing the tax loss harvesting feature and/or in selecting ETFs to include within the pool of available investments in the Portfolios;

     j.   By failing to keep the Plaintiffs' and Class members assets continuously invested in a manner consistent with their chosen investment models;

     k.   By failing to maintain only the agreed portion of the Plaintiffs' and Class Members assets in cash or cash equivalents;

     l.   By failing to daily execute transactions necessary to maintain the Plaintiffs' and Class Members' respective investment strategies; and

     m.   In other ways to be discovered in the course of this action or proven at trial.

78.    As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and Class members have suffered actual damages, including, but not limited to, financial losses incurred from the improper management and administration of automatic tax-loss harvesting sales.  Plaintiffs are informed and believe that they are entitled to compensation from these Defendants, jointly and severally, for such actual damages.

79.    Plaintiffs do not allege that Defendants made any misrepresentation or omission of material fact in connection with the purchase or sale of a security or with the management and

administration of the automatic tax-loss harvesting feature in the Portfolios.  Defendants simply failed to perform the automatic tax-loss harvesting due to Defendants' failure to have sufficient, appropriate investment options available for proper operation of the automatic tax-loss harvesting feature, or in the alternative to have a "stop" feature in the tax-loss harvesting program that would prevent the ETFs from being sold when there was no repurchase option available.

80.    Plaintiffs do not allege that Defendants used or employed any manipulative or deceptive device or contrivance in connection with purchase or sale of a security or with the management and administration of the automatic tax-loss harvesting feature in the Portfolios. Defendants simply failed to perform the automatic tax-loss harvesting due to Defendants' failure to have sufficient, appropriate investment options available for proper operation of the automatic tax-loss harvesting feature, or in the alternative to have a "stop" feature in the tax-loss harvesting program that would prevent the ETFs from being sold when there was no repurchase option available.

## DEMAND FOR JURY TRIAL

Plaintiffs and Class members request a jury trial on all issues deemed triable to a jury.

WHEREFORE, having fully set forth their Second Amended Complaint, Plaintiffs and Class members respectfully pray this Court to:

a.    On the First Cause of Action (Breach of Contract), make Plaintiffs and Class members whole by an award of actual damages, including, but not limited to, financial losses incurred from the improper management and administration of automatic tax-loss harvesting sales;

b.    On the Second Cause of Action (Negligence / Gross Negligence), make Plaintiffs

and Class members whole by granting an award of actual damages, including, but not limited to, financial losses incurred from the improper management and administration of automatic tax-loss harvesting sales;

c.    The costs of this action; and

d.    Such other and further damages and relief as the Court deems appropriate.

DATED this 8th day of May, 2019.

Respectfully submitted,

*s/ Jason W. Grams*
Jason W. Grams, #24596
Lamson Dugan & Murray, LLP
10306 Regency Parkway Drive
Omaha, NE  68114
Telephone:  (402) 397-7300
Fax: (402) 397-7824
Email: jgrams@ldmlaw.com

*s/ Ronald B. Cox*
Ronald B. Cox (SC Bar No. 11129)
R. David Proffitt (SC Bar No. 11193)
Proffitt & Cox, LLP
140 Wildewood Park Drive, Suite A
Columbia, SC  29223
Telephone:  (803) 834-7097
Fax:  (888) 711-1057
Email:  rcox@proffittcox.com
Email:  dproffitt@proffittcox.com

*s/ Brady R. Thomas*
Brady R. Thomas (SC Bar No. 72530)
Alonzo J. Holloway (SC Bar No. 101755)
Richardson, Patrick, Westbrook & Brickman, LLC
2700 Middleburg Drive, Suite 220
Columbia, SC 29204
Telephone:  (803) 541-7838 (d)
Telephone:  (803) 722-1721 (d)
Email:  bthomas@rpwb.com
Email:  aholloway@rpwb.com

Attorneys for Plaintiffs